Robertson, J.
The expenses sought to be recovered in this case, for transhipping and carrying to its destination the cargo which formed the subject of insurance, grew out of - damage to the vessel carrying such cargo on the voyage insured. Such damage appears to have been occasioned by a leak created during the first four hours of such voyage; after which time she returned to port. The answer sets up unseaworthiness in the vessel at the time of her leaving port on such voyage, and denies the loss by perils of the sea insured against, as alleged in the complaint.' *276 On the trial, a motion to dismiss the complaint, on the ground of a-want of seaworthiness and a- failure to prove a loss by. perils insured against, was denied, to which an exception was taken. 5?he question of seaworthiness, as well as loss by proper perils, was. .left to the jury, who found, on a special quéstion to that effect,: that the vessel was seaworthy when she left port.
.. The inadequacy of the perils encountered to produce the sea-damage in question to a seaworthy vessel, was relied upon by the defendants to establish unseaworthiness, to which, they added evidence of age and the character of the materials of which the vessel was built, and of worm-holes in her planking above the copper. The plaintiffs established the thorough repair of the vessel at the port which she left on her previous voyage to the port from which she sailed on the voyage in question ;■ also her sound appearance and tightness before starting;, and claimed from that, with the perils encountered as described by her Captain,. and the damage thereby done to her masts .and spars,' indicating their violence, to have established injury by extraordinary perils, to a seaworthy vessel. It will thus be seen that the degree of. violence of the perils is material to either view, and, in effect, the essential point of the case, as there is no direct evidence of unseaWorthiness. If she was unseaworthy, the leak may be .fully accounted for without extraordinary perils: on the other hand, if the perils were extraordinary, the deduction of unseaworthiness from the facts proved is not necessary-to account for the leak.
From these views it results that the exception to the refusal to dismiss -the complaint covers the same ground as the objection made to the verdict, that it is against the weight of evidence or without evidence; for if the evidence was such, as that the jury might find a verdict therefrom against the defendants, it would be error to set, aside their verdict upon the ground of being without or against evidence, when there is no conflict of testimony,- as to the perils encountered or their result. This brings us to the question whether the evidence offered by the plaintiffs of extraordinary perils, such as those insured against, was enough to go to the j ury upon the question of unseaworthiness as well .as of such perils.
The question of unseaworthiness, which has been sometimes said to be a question of law, was determined in this Court in the *277 case of Sherwood v. Ruggles, (2 Sand. S. C. R., 55,) to be a question of fact; still as a fact, it may require control by the Court of the evidence to sustain it. It has been supposed that the cases in the House of Lords in England, of Watson v. Clark, (1 Dow., 344,) Parker v. Potts, (3 id., 23,) and Douglas v. Scougall, (4 id., 269;) as well as that of Cort and another v. Delaware Insurance Company, (2 Wash. C. C. R., 375,) in a Federal Court, and of Talcot v. Commercial Insurance Company, (2 John., 124, 467,) in our own courts, support the doctrine of seaworthiness being a question of law, although in the last case a verdict by a jury was finally sustained. It is true, that the fact of the Courts undertaking to inquire in those cases into the character of the perils proved, and their determination that they were not sufficient to have injured a seaworthy vessel, may be construed into a decision that seaworthiness is a question of law; but no such principle is declared. It is not claimed in any of them that the Court is to be deemed possessed of sufficient knowledge of nautical matters to instruct a jury in all cases whether the perils proved were within the policy and could produce the damage complained of to a seaworthy vessel, it is only assumed that the Court possess sufficient knowledge to be able to say that the perils proved to have been encountered in some cases were not sufficient to injure a seaworthy vessel; as it is matter of almost common knowledge that even the winds, necessary to carry a vessel on her voyage, which are ordinarily encountered, produce some commotion, and perhaps enough to terrify a landsman, even by description. Lord Eld on, in the case of Watson v. Clark, appeals, I may say, to his own ignorance of nautical matters, for he frankly confesses his want of skill in them when he says that “ he should not he much afraid though he heard seamen talking of ” such perils as were testified to in that case, viz., “ fresh gales and squally weather.” I can see no reason why Courts which are every day called upon to pass upon questions of collision, freight, salvage and marine insurance, may not be presumed to have some knowledge of the nature-of the elements, which are the instruments and subjects of such torts and contracts; particularly when they are merely called upon to intercept immaterial evidence upon its passage to the jury, who being engaged in different occupations, may not have any know *278 ledge of what is or is not an extraordinary disturbance of sea and air, and to whom even the perils testified to in the cases I have cited might seem unduly great.
. It may be contended that it is impossible to draw the boundary line between extraordinary and ordinary perils of the ocean, and the Court cannot so define it as to guide the jury. The same difficulty however exists in many questions arising in litigated cases, such as reasonableness of time or distance, the sufficiency of the reason for not delivering chattels mortgaged or sold, and probability of cause for a complaint before a magistrate; in such cases it is easy to define the extremes which are of one or the other classes, but within them when the cases, come down to doubtful ones, they should be left to the jury. In this division, hfiwever, of perils, there is always a resource in cases in which the Court is doubtful, as experts may be called in to pass upon those proved, to assist the jury in coming to a conclusion. An extreme case will test the principle. Ho one will contend that the fact of a vessel merely going to sea, and having a propelling breeze to drive her on her course, would be evidence to go to the jury, of perils sufficient to cause her to spring a leak, if so the degree of violence of the wind at which such evidence may be allowed to go to a jury, must be regulated by the Court.
The perils relied upon in this case are clearly described. The leak and its commencement during such perils, are clearly given. Other injuries to the mast, spars and rigging, discovered after the return of the vessel into port, are all in evidence and before us, and there is no conflict of testimony in regard to them. So that there is no difficulty in determining whether the facts thus proved could establish perils insured against, encountered by a seaworthy vessel in this case.
The vessel in this case returned into port, after going about twenty-five to thirty miles to sea, during four hours, and arrived in port three days after she sailed; the character of the weather and her action on her return are not given. She started under full sail, while a heavy swell was heaving in from the southward, '“ but the wind increased suddenly, and the sea increasing at the same time, caused her to labor and jump into the sea ”; this apparently immediately followed the increase of wind and waves, but how .long.such “ labor ” .and. “jumping” continued *279 does not appear. After it, the vessel was found to take in water. Sail was then taken in, and the canvas reduced, until only two topsails remained; but when, during what time or why, does not appear. A leak then began; when, does not appear, but which remained about the same after shortening sail; the place of that leak was never found, notwithstanding three surveys, after her return. There is a singular want of definiteness, minuteness and particularity, in the description by her captain, the only witness examined as to the perils, of what occurred during the four hours before the vessel changed her course back. Ho account is given when or how her masts were sprung, or to what extent shé labored or jumped. The wind is described as being merely a “ strong, double-reefed topsail breeze,” not a gale or a storm; the very fact of calling it a breeze, and giving it a special character, goes to show that it was one of not an uncommon kind; and that it was one which was taken advantage of, although with diminished canvas. All the cases I have cited show greater perils than these, and no one can doubt that the ocean has been traversed, myriads of times, in perfect safety with such a breeze; and few seamen would hesitate to encounter a similar one on every voyage. But it may be said, the springing of the foremast maintopsail-yard and maintopmast-fid, stranding of top-gallant-backstays and loss of tressle-trees, with the starting of a head-knee, prove the violence of the wind, which would be true, if they occurred before her changing her course towards the port of departure, and before the leak, which was as violent at the beginning as at the end of the blow. We have no information as to the state of the weather on her return to port. Such injuries might have been the result of having old timber, spars or rigging, the rusting of bolts or fastenings, or a heavily-laden vessel, with a leak, at the rate of twelve inches an hour, pitching and rolling .in the trough of the sea. The leak is the turning point in the history of the vessel; if the violence of the winds and waves was sufficient to have created it in a seaworthy vessel, the plaintiffs are entitled to recover; but there is no evidence to prove it. I do not think, therefore, it is any stretch of the prerogative of the Court to assume to know enough of nautical matters to hold that such a leak could not be created, by such a breeze, in a seaworthy *280 vessel, and that there was no evidence of such perils as were insured against.
The judgment, therefore, must be reversed, with costs; leaving the defendant the right to a new trial.
Bosworth, Ch. J.
I understand the rule to be as stated in Arnould, (vol., l,p. 686, §255,) that where a ship becomes so leaky or disabled as to be unable to proceed on her voyage, soon after sailing on it, and this cannot be ascribed to any violent storm, or extraordinary peril of the seas, the fair and natural presumption is, that it arose from causes existing before her setting out on her voyage, and consequently that she was not seaworthy when she sailed.
In this case no violent storm or extraordinary peril was shown.
The jury found specially that the vessel “ was seaworthy for her proposed voyage, when she left Bio, at 9 o’clock in the morning.” This was so found, contrary to the evidence and to the conclusion which the law draws from it.
As I read the charge, I infer that the Judge, before whom the action was tried, had a very clear opinion that the defendants were entitled to a verdict; and that any one hearing the charge could not fail to discover that such was his opinion.
In this view the verdict is against evidence, contrary to law and the charge of the Court. It should be set aside, and a new trial granted, with costs to abide the event.
Ordered accordingly.